# Exhibit VW 2



## LICENSE AGREEMENT

This License Agreement (this "***Agreement***"), dated as of 28 September 2017 (the "***Effective Date***"), is between BMT Designers & Planners, Inc., a New York corporation ("***BMT***"), as the licensor, and Vigor Works LLC, an Oregon limited liability company ("***Vigor***"), as the licensee. Vigor and BMT may be referred to individually as a "***Party***," and collectively as the "***Parties***."

### BACKGROUND

A.      BMT and/or certain of its Affiliates (defined below) have developed an innovative landing craft design, and have special expertise in assessing vessel reliability, maintainability, and availability, post-delivery support, and other services related to a vessel's life cycle.

B.      Vigor and Vigor's affiliate Vigor Kvichak LLC, formerly known as Kvichak Marine Industries, Inc. ("***Kvichak***") have extensive expertise in the construction of complex aluminum vessels.

C.      BMT, Vigor, and Kvichak have been working together to offer their combined vessel design and vessel construction expertise to the United States Army in connection with its replacement of its fleet of Landing Craft Mechanized 8 Mod I and II vessels with a new vessel known as the Maneuver Support Vessel (Light) (the "***MSV(L)***").

D.      In connection with that collaboration, BMT and Kvichak entered into a Teaming Agreement dated 28 April 2015 (the "***Teaming Agreement***"), and a Technical Assistance Agreement was executed on or about September 1, 2015, and amended on or about October 26, 2017 (collectively, the "***TAA***").

E.      On September 28, 2017, the United States Army awarded Contract W56HZV-17-D-0086 (the "***Prime Contract***") to Vigor for the design and delivery of the MSV(L).

F.      Contemporaneously with the execution and delivery of this Agreement: (a) the Parties are entering into a Master Subcontract Agreement (MSV(L)) (as it may be amended in accordance with its terms, the "***MSVL Subcontract***") that describes the terms and conditions under which BMT will support Vigor in connection with the Prime Contract, including by creating and modifying the drawings and designs of the MSV(L); and (b) BMT D&P's ultimate parent, BMT Group Ltd, is executing and delivering to Vigor a bank guarantee in the form attached as <u>Exhibit 1</u>.

G.      The purpose of this Agreement is to describe the terms and conditions under which BMT is granting Vigor an exclusive license to use BMT's drawings, designs and other deliverables to produce, modify, service, repair, and maintain the MSV(L) pursuant to the Prime Contract and to use those drawings, designs and other deliverables to manufacture and sell similar vessels to customers other than the Army and to support those other vessels after delivery.

### TERMS AND CONDITIONS

**1.      Definitions.** The following capitalized terms will have the meanings assigned to those terms in this Section. Any other capitalized term that is used but not defined in this Agreement will have the meaning assigned to that term in the relevant Subcontract.

1 - License Agreement

Initials

An "*Affiliate*" of a specified person means any other person that controls, that is controlled by or that is under common control with, that specified person.  BMT Nigel Gee and BMT Defence Services are and will be deemed to be Affiliates of BMT.

"*Army*" means the United States Army.

"*Army Vessel*" means a MSV(L) Vessel initially described by the data included in <u>Appendix A</u> and ultimately defined as any Vessel that Vigor builds and delivers to the Army under the Prime Contract.

"*Authorized Representative*" means a Party employee that has been authorized by such Party to represent its interests under this Agreement.

"*Background IP*" means any Intellectual Property that was created or otherwise within BMT's or its Affiliates' control before it or its Affiliates began work on the design of the Army Vessel, including the Hull Form for BMT's Caimen® landing craft.

"*Baseline IP*" means the Hull Forms, drawings and designs listed on <u>Appendix A</u> of this Agreement.

"*BMT Hull Form*" means (a) the Hull Form(s) reflected in the Baseline IP; (b) the Hull Forms included in other Deliverables; and (c) any and all Hull Forms that either BMT or Vigor creates that are derivative works of those Hull Forms.

"*Customer*" means a person who purchases a Vessel from Vigor or from any of Vigor's Affiliates, including the Army, any foreign government, or any commercial purchaser.

"*Customer Contract*" means and includes the Prime Contract and any other contract between Vigor and any Customer other than the Army for the production, modification, service, repair and maintenance of Vessel(s).

"*Deliverables*" means and includes:  (a) all Project IP and any documents that BMT delivers that reflect Project IP; and (b) all tangible goods and other material that BMT furnishes or is to furnish under a Subcontract.  While the term "Deliverables" includes Source Documents for goods manufactured by BMT or its Affiliates, for purposes of this Agreement, that term does not include Third Party Source Documents for goods manufactured by any of BMT's subcontractors or vendors who are not Affiliates of BMT.

"*Government*" means the Army and any other agency, department, division or subdivision of United States of America.

"*Hull Form*" means the external geometry (size and shape) of the hull from keel up to full load waterline level.

"*Intellectual Property Rights*" means all intellectual property rights, including vessel hull design rights, patent rights, copyrights, moral rights, trademark rights, trade name rights, service mark rights, trade dress rights, trade secret rights, proprietary rights, privacy rights, and publicity rights, whether or not those rights have been filed, registered or applied for under any statute or are protected or protectable under applicable law.

"*Order*" means a work order, purchase order, or comparable document or collection of documents sent by Vigor to BMT under a Subcontract, that either alone or taken together: (a) identifies the Deliverables, Services or other work that BMT is to provide and the date that work is to be provided;



(b) describes the price and payment terms, and any special terms or conditions governing, the work; and (c) has been executed by an Authorized Representative of Vigor.

"*Performance/Reliability Incentive*" means with respect to Vessels sold to the Army under the Prime Contract, twenty-five percent (25%) of the performance incentive that Vigor actually receives under CLIN 0008 of the Prime Contract.

"*Project*" means the design, production, testing, delivery, and post-delivery support of the Vessel(s), whether under the Prime Contract with the Army or any other Customer Contract.

"*Project IP*" means the Intellectual Property Rights embodied in the documents, tangible goods, data, and materials that BMT has provided, will provide or is obligated to provide to Vigor for the Project or a Customer Contract, including: (a) the Baseline IP; (b) all other drawings, designs, sketches, blue prints, models, work packs, and templates; (b) all project management, planning and program documents; (c) all reports; (d) all engineering data, analyses, and calculations; (e) all logistics data; (f) all technical purchase descriptions and all other Specifications; (g) all samples, patterns, and data; and (h) all trade secrets, inventions, discoveries, creations, and work inscribed on a tangible medium or stored in an electronic or other medium; except that the term "Project IP" does not include (i) any Third Party Source Documents, (ii) any of BMT's generally applicable methodology for creating designs or engineering or information or materials that are a component of such methodology, or (iii) any Intellectual Property Rights created by Vigor, its Affiliates, or their other agents (other than BMT), or (iv) the Background IP, or the Intellectual Property of any unrelated third party, except and to the extent it is incorporated in the Baseline IP or other Deliverables.

"*Protest*" means any protest of the Army's award of the Prime Contract to Vigor.

"*Prototype*" means the first Vessel fabricated by Vigor under CLIN 0002 of the Prime Contract (aka, the test article).

"*Qualified Independent Auditor*" means a natural person reasonably acceptable to the person whose books and records are being audited or inspected, who (a) is a certified public accountant and a member of a national (or with the consent of the person whose books and records are being audited or inspected, a regional) accounting firm; (b) who does not directly or indirectly (including any other member of his or her firm) provide routine auditing or accounting services to either Party; (c) has all required security clearances; and (d) is bound by a written agreement in which that individual agrees: (i) not to use any confidential or proprietary information of the person whose books and records are being audited or inspected, or any of its Affiliates, for any reason other than to perform the audit and inspection; and (ii) not to disclose any such information to the other Party or to any other person, except for the results for which the audit or inspection is conducted and/or in connection with any arbitration or any other legal proceeding relating to that audit or inspection.

"*Schedule Incentive*" for each Vessel sold to the Army under the Prime Contract means BMT's achievement of one or more of the four schedule milestones described in Order No. One issued under the MSVL Subcontract for engineering and manufacturing development (EMD) (i.e., the Schedule Incentive for each EMD milestone is US$5,000 per MSV(L) Vessel and the maximum Applicable Incentive for achieving all four EMD milestones is US$20,000 per MSV(L) Vessel).

"*Source Documents*" means and includes the following for the Deliverables: (a) for Deliverables that are goods manufactured by third persons: (i) a list that identifies the manufacturer of those goods and the manufacturer's names and numbers for those goods; and (ii) any installation, operation, use, repair and maintenance instructions for those goods, parts and components; (b) for Deliverables that are goods manufactured by BMT or any of its Affiliates: (i) a list of those goods, the standard names and numbers

3 - License Agreement


Initials

for those goods, a list that identifies the manufacturer of any parts and components in those goods, and the other information in subsection (a)(i) above; and (ii) all drawings, designs, engineering, and build instructions for those goods; (c) the Source Code for all Software that does not qualify as commercial, off-the-shelf Software; and (d) all other information that can reasonably be expected to be delivered with commercial goods and would be useful to a reasonably skilled programmer, engineer, or analyst to understand, modify, support, repair, and maintain those goods or that Software. Source Documents may appear in a bill of materials, in drawings or designs, or in any other Deliverable.

"***Subcontract***" means and includes the MSVL Subcontract and any other contract in which Vigor engages BMT to perform design, engineering, or other services for a Vessel.

"***Third Party Source Documents***" means the Source Documents for Deliverables that BMT purchases or otherwise acquires from anyone other than an Affiliate of BMT.

"***Type One Sale***" means Vigor's sale under the Prime Contract of an MSV(L) Vessel (except for the Prototype) or group of MSV(L) Vessels to the Army for use by the Army.

"***Type Two Sale***" means Vigor's sale of a Vessel or group of Vessels other than a Type One Sale. A Type Two Sale includes, for example, (a) the sale of a Vessel or group of Vessels to the Army for use by any other department or agency of the Government, for resale in a Foreign Military Sale (FMS), Foreign Military Financing (FMF), or similar Government program, or (b) a direct sale of a Vessel to a foreign government or to a commercial Customer.

"***Vessel***" means any vessel that Vigor or any of its Affiliates builds with a BMT Hull Form.

"***Vigor Developments***" means any and all Intellectual Property Rights that Vigor, its Affiliates, or any of their agents (other than BMT or Affiliates of BMT) discovers, creates or develops in connection with the Project, including any and all construction and fabrication drawings, work packs, as-built drawings, models, and embodiments or modifications of the Project IP, the Source Documents, the Vessel, or any of their component parts, including the portion of any derivative works of the Project IP created by or on behalf of Vigor, its Affiliates, or any of their agents (other than BMT or Affiliates of BMT). For the avoidance of doubt, the term "Vigor Developments" does not include any Project IP that may be included in any derivative works or improvements to the Project IP created by Vigor.

2.     **Prime Contract; Flow-down Clauses.**    With respect to Deliverables and Source Documents for Vessels sold or to be sold to the Government, the following provisions will apply:

2.1     ***Flow Down Clauses.***    To the extent any Deliverables or Source Documents are used or to be used in connection with a Government contract, certain provisions in the Prime Contract and in the Federal Acquisition Regulations ("*FARs*") referenced in <u>Appendix B</u> and the Defense Federal Acquisition Regulations Supplement ("*DFARs*") and other agency clauses that supplement the FARs (collectively, with the FARs and DFARs, the "***Flow Down Clauses***") will apply to this Agreement; therefore, the provisions in the Prime Contract and the Flow Down Clauses that relate to the Deliverables, the Source Documents or any other goods or services provided or to be provided by BMT under this Agreement or the MSVL Subcontract are incorporated in this Agreement, including general, special and detail specifications, payment, acceptance, warranty, and intellectual property ownership provisions.

2.2     ***Prime Contract.***    Vigor has provided a copy of the Prime Contract to BMT and upon BMT's request, Vigor will provide to BMT a copy of the relevant provisions of any other Customer Contract that apply to BMT. Without limiting the preceding and notwithstanding any other provision in this Agreement or any other document by or between the Parties, BMT agrees that: (a) all obligations,

4 - License Agreement



responsibilities and liabilities imposed by the Prime Contract or by the Flow Down Clauses on Vigor, or by operation of law, are and will be assumed by BMT with respect to the Deliverables and any other goods or services provided by BMT under this Agreement; (b) to the extent any standard or requirement in the Prime Contract or in any Flow Down Clauses conflicts with this Agreement or any other document by or between the Parties, the more stringent requirement controls.

  2.3 *Applicability to Lower Tier Subcontractors.* BMT agrees to flow down all applicable provisions in the Prime Contract and in the Flow Down Clauses to BMT's lower-tier subcontractors who provide goods or services related to Vessels to be sold to the Army under the Prime Contract and will flow down all applicable and reasonably foreseeable provisions in any other Customer Contract to BMT's lower-tier subcontractors who provide goods or services related to any other Vessels.

3. License.

  3.1 *Grant.*

  (a) *Exclusive License to Project IP.* Except as expressly permitted in Section 3.2:

   (i) *Royalty Bearing Exclusive License for the BMT Hull Forms.* BMT grants to Vigor, and Vigor has and will have, a perpetual, irrevocable, exclusive (except as to any Government license that arises pursuant to the Prime Contract), worldwide, royalty-bearing license to use the BMT Hull Forms reflected in the Army Vessels, including the following uses: (A) to copy and distribute the BMT Hull Forms in connection with the design, fabrication, manufacture, production, modification, service, repair, and maintenance of Army Vessels and Vessels for other Customers; (B) to make minor modifications to the BMT Hull Form provided such modifications do not impact the hydrodynamics and seakeeping performance of the Hull Form in any material way; (C) to exercise any rights contemplated in the Prime Contract or the same or any reasonably similar rights in any other Customer Contract; (D) to create Vigor Developments; (E) to sublicense and/or assign any or all of the preceding rights to others to the extent reasonably necessary for Vigor to satisfy its obligations to the Army under the Prime Contract and to other Customers under other Customer Contracts, including (1) to the Government and Vigor's other Customers, and (2) to Vigor's subcontractors (including Gladding-Hearn Shipbuilding), suppliers and other vendors who may or will provide goods or services in connection with the production, testing, operation, use, service, repair, maintenance, and/or modification of the Vessels pursuant to the Prime Contract or any other Customer Contracts; and (F) to enforce its rights against any person who uses the BMT Hull Forms. In addition, BMT authorizes Vigor to file precautionary UCC financing statements that reflect Vigor's exclusive license rights in and to the BMT Hull Forms.

   (ii) *Royalty-Free Exclusive License for Other Project IP.* BMT grants to Vigor, and Vigor has and will have, a perpetual, irrevocable, exclusive, worldwide, royalty-free, fully paid up, unrestricted license to use all of the other Project IP (i.e., all of the Project IP other than the BMT Hull Forms will be referred as the "*General IP*"), including as follows: (A) to copy, modify and distribute the General IP; (B) to make or have made vessels or other products and to repair or have repaired vessels or other products; (C) to create Vigor Developments; (D) to sublicense and/or assign any or all of the preceding rights to others; and (E) to enforce its rights against any person who uses the General IP.

  (b) *Nonexclusive, Royalty-Free License to Source Documents.* BMT grants to Vigor, a perpetual, irrevocable, nonexclusive, worldwide, royalty-free, fully paid up license (i) to copy, modify, use, and distribute the Source Documents as necessary or desirable to perform Vigor's obligations under the Prime Contract and the other Customer Contracts; and (ii) to sublicense those rights to others.

5 - License Agreement

Initials

(c)     *Nonexclusive, Royalty Free License to Background IP.*  To the extent the Background IP is embodied in the Project IP, Vigor's rights to use that Background IP will be consistent with the rights described in Section 3.1(a) and (b).

**3.2     *Restrictions on BMT's and Its Affiliates.***  For the avoidance of doubt, (a) Vigor's exclusive rights in Section 3.1(a) above include, and BMT agrees, that except as expressly permitted under a Subcontract or except as expressly permitted otherwise in this Subsection 3.2, BMT will not use, or allow any other person to use, the BMT Hull Forms or any of the other Project IP, for any purpose, and BMT will cause its Affiliates to agree that (i) they will not use, or allow any other person to use, the BMT Hull Forms or any of the other Project IP for any purpose; and (ii) Vigor will have the right to enforce those obligations against each of them; (b) BMT and its Affiliates may independently design vessels, including tri-bow mono hull landing craft, where the term "independently design" means that BMT and its Affiliates will not access or refer to, and will not in any way use, any Project IP to design other vessels; and (c) in no event will either BMT or any of its Affiliates design Vessels that are substantially similar to those reflected in the BMT Hull Forms and/or Project IP, where the term "substantially similar" means that the similarity is so striking or substantial that the similarity could only have been caused by copying or misappropriation and not, for example, as a result of coincidence, independent creation, or access to a prior common source.  In addition, Vigor acknowledges and understands that prior to the Effective Date, BMT Defence Services granted to the government of the United Kingdom certain nonexclusive rights in and to the Background IP and that the exercise of those rights by the British government would not breach the provisions in this Section 3.

**3.3     *No Implied License.***  Except as expressly described in this Section 3, in the Prime Contract, and in the Flow Down Clauses, nothing in this Agreement will be construed as granting to or conferring upon Vigor any right, title, interest, or license in BMT's Intellectual Property Rights.

**3.4     *BMT's Responsibility for its Agents.***  BMT will be responsible if any of its employees, agents, or subcontractors, and/or its Affiliates or any of its Affiliates' employees, agents, or subcontractors, breach or otherwise fail to comply with any of these limitations or restrictions, and BMT will ensure that Vigor has the right to enforce the provisions in this Section 3 against BMT's Affiliates.

**3.5     *Certification and Audit and Inspection Rights.***  BMT will, promptly upon BMT's receipt of a written request, not to occur more than twice annually, from Vigor that identifies a particular design (a **"*Request for Certification*"**), cause a Responsible Officer of BMT to sign, and to deliver to Vigor, written certification (a **"*Certificate*"**) stating that, after due inquiry, each Responsible Officer represents, warrants, and confirms, to their knowledge that BMT nor its subcontractors: (a) used, directly any Project IP in connection with all or any part of the creation of the design described in the Request for Certification; or (b) disclosed any Project IP to any person associated in any way with the design described in the Request for Certification.  The term **"*Responsible Officer*"** means any of the following officers:  Chief Executive Officer, President, Finance Director, Managing Director of Defence, General Counsel, Treasurer, or Chief Financial Officer.  In addition, not more than once each year, Vigor will have the right to have a Qualified Independent Auditor audit BMT and its Affiliates' books and records to verify the information in any such Certificate, subject to reasonable security and access restrictions.  That audit will be performed at the location where the relevant books and records are kept during BMT's and its Affiliates' normal business hours upon not less than 30 days' prior notice to BMT.  The cost of any such audit will be borne by Vigor unless the audit demonstrates that any statement in a BMT Certificate is inaccurate in any material respect, and in that case, BMT will reimburse Vigor's reasonable costs and expenses for that audit.  BMT will be permitted to have BMT personnel present during the audit.

**3.6     *Right of First Refusal for Engineering and Logistics Services.***  If (a) Vigor contracts to sell Vessels to any Customer other than to the Army; and (b) that other Customer Contract requires Vigor to perform design or logistics or any other services that are similar to the services described in an Order under the MSVL Subcontract, and (c) Vigor elects to outsource that work, then Vigor will deliver a

6 - License Agreement



Initials

written offer to BMT describing that work and the price and terms upon which Vigor would engage BMT to perform that work. BMT will have the right to accept that offer, to propose a counter offer (in which case the Parties will negotiate in good faith with respect to that counter offer), or to reject that offer. If BMT rejects the offer or fails to accept it by signing and returning the offer to Vigor within ten (10) business days of BMT's receipt of the offer (i.e., a "deemed rejection"), then Vigor will have the right to submit that offer to others and to enter into a binding agreement with any other person, provided the price for the work is not greater than the price referenced in the offer rejected (or deemed rejected) by BMT.

4.    **Royalty and Fees.**

4.1    *Calculation.* In consideration of the rights granted in Section 3 above and elsewhere in this Agreement, and subject to BMT's compliance with the terms of this Agreement and its obligations under a Subcontract, Vigor will pay BMT a fee (the *"Royalty"*) for each Vessel that Vigor or any of its Affiliates at any time builds, or that Vigor engages Gladden-Hearn or any other subcontractor to build, as follows:

| Vessel | Royalty per Vessel |
|---|---|
| The Prototype | US$2,600,000 |
| Each MSV(L) Vessel sold in a Type 1 Sale | US$260,000 per MSV(L) Vessel plus any Schedule Incentive referenced in Section 4.3 below |
| Each Vessel sold in a Type 2 Sale | US $450,000 per Vessel |

Vigor will not be obligated to pay any Royalty for MSV(L) Vessels the Government builds or engages any person other than Vigor or one of its Affiliates to build.

4.2    *Payment Milestones.* The Royalty for each Vessel or group of Vessels will be fully earned in accordance with the following milestones (the *"Payment Milestones"*):

| Vessel | Payment Milestone |
|---|---|
| The Prototype | • 90% of the Royalty for the Prototype when the Government has dismissed all Protests and all appeals of that dismissal have been fully and finally determined and has authorized and instructed Vigor to proceed with construction of the Prototype; and<br><br>• 10% of the Royalty for the Prototype when Vigor becomes entitled to payment from the Government for delivery of the Prototype to the Army |
| Each Vessel sold in a Type 1 Sale or a Type 2 Sale | • 50% of the Royalty for each such Vessel upon award of the Vessel to Vigor; and<br><br>• 50% of the Royalty when Vigor becomes entitled to payment from the Customer for delivery of that Vessel. |

Initials

**4.3    Incentives.**

(a)    If the Government pays Vigor a performance incentive under CLIN 0008 of the Prime Contract, Vigor will notify BMT of that payment and will, within 45 days of Vigor's receipt of that payment, pay BMT the Performance/Reliability Incentive.

(b)    If BMT achieves any one or more of the four (4) schedule milestones described in Order No. One under the MSVL Subcontract for the MSV(L) Vessels, BMT will promptly notify Vigor of that achievement and the per Vessel Royalty for Type 1 Sales stated in Section 4.1 above will be increased by the applicable Schedule Incentive.

**4.4    *Taxes.*** BMT will pay any and all national, federal, state and local sales and use taxes, ad valorem taxes, value added taxes, tariffs and duties on the Royalties.

**4.5    *Records.*** Vigor will keep complete and accurate records in accordance with generally accepted accounting principles and practices regarding the Payment Milestones, including Vigor's receipt of final payment for the Vessels from Customers (collectively, the "***Records***"). Without limiting the preceding, Vigor will keep Records in sufficient detail to enable BMT to determine whether a Payment Milestone has occurred and the amount of the Royalties due and owing or to become due and owing under this Agreement. Vigor will maintain those Records for each Order for a period of three years after delivery of the Vessel or group of Vessels referenced in that Order.

**4.6    *Reports.*** Within 45 days after the end of each calendar month (each, a "***Reporting Period***"), Vigor will furnish to BMT a report in the form attached as <u>Appendix C</u> to this Agreement (each, a "***Report***") describing: (i) the Payment Milestones that occurred during that Reporting Period (e.g., the dismissal of all Protests and the expiration of any and all appeal periods and receipt of final payment for a Vessel during that Reporting Period); and (ii) the calculation of the Royalties due for that Reporting Period.

**4.7    *Invoicing; Payment Terms.*** BMT will upon its receipt of each Report promptly invoice Vigor for the Payment Milestones reflected in that Report. Each invoice submitted by BMT (a) must reference the Report and the Reporting Period to which it relates; and (b) in the case of Royalties payable in connection with the Prototype or a Type 1 Sale, must be in such form so as to entitle Vigor to properly make a progress payment request for the amount of the invoice to the Government in accordance with FAR 52.232-16, Progress Payments, and to receive payment in response to such request within 30 days of the date upon which it was submitted to the designated Government billing office, including delivering to Vigor, lien, bond, retainage, and claim waivers and affidavits from BMT and its licensors using the appropriate form from the MSV(L) Subcontract. Vigor will pay BMT, within 45 days of the first day of the month, the undisputed amount due and owing under each invoice received by Vigor before the 20th day of the prior month. For Vigor's unexcused failure to pay any invoice when due, Vigor will pay to BMT a late fee equal to one percent (1.0%) per month of the unpaid balance from the date payment was due until it is paid in full.

**4.8    *Audit Rights.*** Not more than once each year, BMT will have the right to have a Qualified Independent Auditor audit the Records as necessary to verify the information in Vigor's Reports and Vigor's calculation of the Royalty, subject to reasonable security and access restrictions. That audit will be performed at the location where the relevant Records are kept during Vigor's normal business hours upon not less than 30 days' prior notice to Vigor. The cost of any such audit will be borne by BMT unless the audit demonstrates that Vigor owes BMT a correcting payment for the period covered by the audit of more than five percent of the amount Vigor reported to BMT during that period, and in that case, Vigor will reimburse BMT's reasonable costs and expenses for that audit. Vigor will be permitted to have Vigor personnel present during the audit. As long as Vigor pays the underpayment and audit costs described above, Vigor will not be deemed to be in breach of this Agreement. Each audit will be completed within 45 days of Vigor's receipt of notice.

8 - License Agreement

| Initials |
| --- |
|  |

**4.9     *IRS Form W-9.*** BMT will submit to Vigor a fully and accurately completed and signed Internal Revenue Service Form W-9 (Request for Taxpayer Identification Number and Certification) or W-8 within 15 days after the Effective Date. The due date for Vigor's payment obligation under this Section will be extended on a day-for-day basis for each day of BMT's delay in providing a Form W-9 or W-8, as applicable.

**5.     Representations, Warranties, and Covenants.**

**5.1     *By BMT.*** BMT represents, warrants, and covenants to Vigor as of the Effective Date, and BMT will be deemed to have reaffirmed on each subsequent date that BMT delivers a Deliverable to Vigor, that:  (a) Vessels built in accordance with the Project IP will meet the requirements in the Customer Contract unless and to the extent any failure or defect was caused by (i) Vigor's failure to construct the Vessel in accordance with the Project IP; or (ii) an unauthorized modification of the Project IP or the Vessel by Vigor, by the Customer, or by any other person other than BMT and BMT's agents; or (iii) the failure of any third party parts, components or equipment specifically identified in the relevant Project IP to comply with the manufacturer's written specifications or warranty for those goods; or (iv) a change imposed by Vigor despite BMT's timely objection; (b) BMT owns, or has a license with the right to grant to Vigor, all Intellectual Property Rights in and to the Project IP as described in Section 3 (License) above, including the exclusive rights described in Section 3.1(a) (Exclusive License to Project IP); (c) neither BMT nor any of its licensors has granted, and BMT will not grant (and will ensure that none of its licensors grant) to any other person any license or other right that breaches or conflicts or is otherwise inconsistent with this Agreement, including the exclusive license rights described in Section 3.1(a) (Exclusive License to Project IP) and the restrictions in Section 3.2 (Restrictions on BMT's and Its Affiliates); (d) the Project IP, whether owned by BMT or subject to a license in favor of BMT, is and will remain free from all liens, encumbrances and claims of any other person; (e) BMT's performance of its obligations under this Agreement will not breach any other agreement by which it is bound and will not violate the rights of any other person, and Vigor may use the Project IP without payment to any other person; (f) Vigor's use of the Project IP in the form delivered or provided by BMT for the purposes contemplated by the applicable Customer Contract does not and will not violate any law, regulation, or order of any national, state, or local governmental authorities, whether domestic or foreign, or interfere with any contracts with third parties; (g) BMT is duly authorized to enter into and perform its obligations under this Agreement, and this Agreement is enforceable against BMT in accordance with its terms; (h) BMT has delivered to Vigor a true, accurate, and complete copy of each license agreement by which BMT has rights in and to the Project IP (each, a "***Third Party IP License***") except that BMT may redact the royalty amount from each such Third Party IP License and any business confidential information; (i) BMT will not modify or amend any provision in any Third Party IP Licenses that will or may negatively affect Vigor, without Vigor's prior written consent, which Vigor may grant, condition, or withhold in its sole but reasonable discretion; and (j) each Third Party IP License between or among BMT and one or more of its Affiliates will:  (1) include representations, warranties, and covenants that are comparable to those in subsections (a) through (i) of this Section 5.1, and (2) expressly state that Vigor is an intended third party beneficiary of that Third Party License and has the right to enforce that license against each such BMT Affiliate, and in no event will BMT modify or amend those provisions, without Vigor's prior written consent.

**5.2     *By Vigor.*** Vigor represents, warrants, and covenants to BMT that: (a) Vigor's performance of its obligations under this Agreement will not breach any other agreement by which it is bound and will not violate the rights of any other person; and (b) Vigor is duly authorized to enter into and perform its obligations under this Agreement, and this Agreement is enforceable against Vigor in accordance with its terms.

| Initials |
| --- |
|   |

6.      **Intellectual Property.**

6.1      *Ownership.* As between the Parties and except as expressly provided otherwise in the Prime Contract and this Agreement, BMT will own the Intellectual Property Rights it creates or develops, and Vigor will own the Intellectual Property Rights it creates or develops. To the extent permitted by and consistent with the Prime Contract, BMT will affix appropriate legend(s) in <u>Appendix D</u> to each of BMT's Deliverables. BMT (a) authorizes (but does not require) Vigor, at Vigor's sole cost and expense, to register the Project IP under the United States Copyright Act (Title 17 of the United States Code), the United States Vessel Hull Design Protection Act (Title 17 Chapter 13 of the United States Code) and/or any comparable statutes in any foreign jurisdiction; (b) will cooperate with Vigor in the registration of the Project IP; and (c) irrevocably appoints each of the officers of Vigor as BMT's attorney-in-fact to sign such documents, make such statements, and take such actions as are reasonably necessary or desireable to register or otherwise protect the Project IP under applicable law, which authority Vigor may exercise only if, after reasonable request, BMT fails or refuses to do so.

6.2      *Confidentiality.*

(a)      *Confidentiality.* The term *"Confidential Information"* means all information of and about the Project, BMT, Vigor, the Government and the other Customers, their respective employees, advisors, and suppliers, whether in oral, written, or other tangible or intangible form, (including, business plans, financial plans and information, computer programs, technical drawings, know-how, inventions, product development plans, preliminary product descriptions and specifications, Customer information, forecasts, strategies, trade secrets and other similar information), except that the term "Confidential Information" will not include any information that the party disclosing the information (the *"Disclosing Party"*) can demonstrate: (i) is or subsequently becomes publicly available without the party receiving the information's (the *"Receiving Party"*) breach of any obligation owed to the Disclosing Party, ; or (ii) any of the following as evidenced by the Receiving Party's written records: (A) it was known to the Receiving Party before the Disclosing Party's disclosure of that information to the Receiving Party; (B) it became known to the Receiving Party from a source other than the Disclosing Party without a breach of this Agreement; (C) it is independently developed by the Receiving Party's personnel.

(b)      *Obligations.* The Receiving Party will maintain the Confidential Information in confidence and will not use the Confidential Information for any purpose except to perform its obligations. The Receiving Party agrees to use the same degree of care in protecting the Confidential Information as it uses to protect its own confidential and proprietary information from unauthorized use or disclosure, but in no event less than reasonable care. In addition, the Receiving Party agrees that: (i) it will not reproduce the Confidential Information in any form except as required to accomplish its obligations under this Agreement; (ii) except as expressly permitted in Section 6.2(c) below, it will only disclose the Confidential Information to its directors, officers, employees, professional advisors and/or contractors who have a need to know such Confidential Information in order for directors, officers, employees, professional advisors and/or contractors to perform their duties under this Agreement and only if those directors, officers, employees, professional advisors and/or contractors have executed a non-disclosure agreement with Receiving Party with terms no less restrictive than the non-disclosure obligations contained in this Section 6.

(c)      *Compelled Disclosure.* If the Receiving Party is required to disclose any Confidential Information under any subpoena, interrogatory, request for production or other compulsory judicial or administrative process that calls for or may result in the disclosure of any Confidential Information, the Receiving Party will immediately notify the Disclosing Party so the Disclosing Party may seek protection of that Confidential Information if it wishes to do so. Only after giving such notice may the Receiving Party disclose that Confidential Information and then only to the extent the Receiving Party is legally compelled to do so. The Receiving Party will immediately notify the Disclosing Party upon discovering any loss or unauthorized disclosure of any Confidential Information.

10 - License Agreement



(d)     *Relief.* The Receiving Party acknowledges that due to the unique nature of the Confidential Information, the Disclosing Party would not have an adequate remedy in money or damages in the event of any unauthorized use or disclosure of its Confidential Information. Therefore, in addition to any other remedies that may be available in law, in equity or otherwise, the Disclosing Party will be entitled to request injunctive relief to prevent such unauthorized use or disclosure of the Confidential Information.

(e)     *Term.* The Receiving Party's obligations under this Section 6 will continue for five (5) years from the date of first disclosure of the Confidential Information unless that Confidential Information qualifies as a trade secret under applicable law, and in that case, the Receiving Party's obligations under this Section 6 will continue for as long as that information qualifies as a trade secret under applicable law.

**6.3     Grant of Security Interest.** To secure the prompt payment and performance of BMT's obligations under this Agreement and under each Subcontract, BMT hereby grants and pledges to Vigor a continuing security interest (and to the extent applicable, a purchase money security interest) in and to the following (the "**Collateral**"): (a) all Deliverables; and (b) all products and proceeds of the preceding. BMT represents and warrants that neither BMT nor any other person has registered or has applied to register the copyright(s) in and to any of the Collateral in the United States, in the United Kingdom, or in any other jurisdiction, and BMT covenants that neither it nor any of its Affiliates will register or apply to register any such copyrights unless BMT first gives Vigor at least 30 days' prior written notice of the Project IP and Deliverables to be registered, the jurisdiction of the registration, and any other information reasonably requested by Vigor.

**7.     Communications with Customers.** BMT's rights and obligations regarding interactions with Customers are described in the relevant Subcontract.

**8.     Compliance with Laws.** The Parties have complied, and will in the future comply, with applicable domestic and foreign laws, rules, regulations, and executive orders, including the Foreign Corrupt Practices Act, anti-boycott laws, U.S. export control laws and regulations governing the transfer, export, or re-export of technical data, executive orders imposing restrictions on trade with Russia, rules regarding the use of conflict minerals, rules against money laundering, and rules prohibiting dealing with specially designated nationals and persons on the blocked persons list. In addition, BMT will be bound by, and at its own cost comply with, all applicable provision in the Prime Contract and with the Flow Down Clauses.

**9.     Indemnification.**

**9.1     Definition of Loss and Losses.** "**Loss**" or "**Losses**" includes:     (a) all reasonable attorney fees incurred by a Vigor Indemnitee (defined below) or a BMT Indemnitee (defined below) (in either case, an "**Indemnitee**") in defense of any claim that is covered by or subject to indemnification under this Section 9, whether incurred prior to, at trial or any other proceeding and in any appeal or other post judgment proceeding, and whether or not paid or to be paid; and (b) all losses and damages, including incidental, consequential, punitive and exemplary damages, paid or payable to an unrelated person, including for property damage, for infringement, and for personal injury, sickness and death; (c) all interest, costs, fines, taxes, premiums, assessments, penalties, and expenses paid or payable to an unrelated party that are covered by or subject to indemnification under this Section 9.

**9.2     BMT's Indemnification Obligations.** BMT will indemnify, defend, and hold harmless Vigor and its officers, directors, shareholders, employees and agents ("**Vigor Indemnitees**") from and against all Losses arising from or related to a claim asserted against the Vigor Indemnities directly or indirectly by any unrelated party (a) alleging that the Deliverables or their use infringes or misappropriates any Intellectual Property Right of that other person; or (b) related to any: (i) defect in the Deliverables provided by BMT; (ii) negligent act or omission by BMT or any of its agents; (iii) breach of any representation,

11 - License Agreement



warranty or covenant in this Agreement or elsewhere by BMT or any of its agents; (iv) violation of any applicable law by BMT or any of its agents; or (v) claim that any of BMT's or its agents' employees, principals, contractors or subcontractors are employees of Vigor; in each case, whether arising from or in connection with a demand, action, regulatory action, lawsuit, proceeding (including proceedings under the US Bankruptcy Code), judgment, settlement, appeal or other post judgment proceeding and whether asserted in contract, tort, strict liability or otherwise.

**9.3** ***Vigor's Indemnification Obligations.*** Vigor will indemnify, defend, and hold harmless BMT and its officers, directors, shareholders, employees and agents (the "***BMT Indemnitees***") from and against all Losses arising from or related to a claim asserted against the BMT Indemnitees directly or indirectly by any unrelated party (a) alleging that any materials provided by Vigor, or their use, infringes or misappropriates any Intellectual Property Right of that other person; or (b) related to any: (i) defect in Vigor's work on a Vessel; (ii) negligent act or omission by Vigor or any of its agents; (iii) breach of any representation, warranty or covenant in this Agreement or elsewhere by Vigor or any of its agents; or (iv) violation of any applicable law by Vigor or any of its agents; in each case, whether arising from or in connection with a demand, action, regulatory action, lawsuit, proceeding (including proceedings under the US Bankruptcy Code), judgment, settlement, appeal or other post judgment proceeding and whether asserted in contract, tort, strict liability or otherwise.

**9.4** ***Exceptions.*** The indemnification obligations described above will not apply to a Loss to the extent that Loss was caused by: (a) the negligent act or omission of an Indemnitee; (b) an Indemnitee's breach of its representations, warranties or covenants in this Agreement or elsewhere; (c) an Indemnitee's intentional misconduct; or (d) an Indemnitee's violation of any applicable law. In addition, BMT's indemnification obligations will not apply to a Loss to the extent that Loss was caused by Vigor's modification of the Deliverables without BMT's consent (other than those modifications contemplated by the Parties).

**9.5** ***Procedures.*** The duty of a Party (the "***Indemnitor***") to indemnify an Indemnitee of the other Party under this Section 9 or elsewhere in this Agreement is subject to the Indemnitees' compliance with each of the following conditions: (a) the Indemnitees promptly notify the Indemnitor of the Loss (except that the Indemnitees' failure to promptly notify the Indemnitor of a Loss will not limit, impair or otherwise affect the Indemnitees' rights under this Section 9 unless the Indemnitor is prejudiced by that failure, and then only to the extent of the prejudice); and (b) the Indemnitees give the Indemnitor full and complete authority (including without limitation, settlement authority) and reasonable assistance (including without limitation, reasonable access to information in the Indemnitees' possession) for the defense. However, the Indemnitor's rights under subsection (b) are contingent on its agreement that it will not settle any claim without the Indemnitees' prior written consent unless that settlement includes a full and final release of all claims against the Indemnitees and does not impose any obligations on the Indemnitees.

**9.6** ***Additional Remedies.*** Without limiting Vigor's rights under Sections 9.1 through 9.5 above, if all or any part of the Deliverables is held in any infringement suit to infringe the Intellectual Property Right of another person, and its use is enjoined, BMT will, at its own expense: (a) obtain a license for Vigor and its subcontractors, the Government, and the other Customers to continue using those Deliverables as contemplated in this Agreement, and (b) pay on their behalf any fee that may be charged in connection with that license. If a license cannot be obtained on commercially reasonable terms, BMT will modify, replace or re-perform the Deliverables so they become non-infringing while giving substantially equivalent performance and will reimburse Vigor the costs Vigor has reasonably and directly incurred as a result of any such modification, replacement or re-performance, along with testing and training that is functionally equivalent with the original testing and training. Vigor's remedies for breach of this Agreement are not exclusive and are in addition to all other rights and remedies available under this Agreement or applicable law.

**10.** **Injunctive Relief.** Each Party acknowledges that its breach of this Agreement will irreparably harm the other Party, and that such harm may not be susceptible to accurate measurement for
12 - License Agreement

| Initials |
|---|
|  |

the purpose of calculating money damages. Accordingly, in addition to seeking and recovering money damages and other remedies available at law, and notwithstanding Section 16 (Disputes) regarding arbitration, each Party will have the right to obtain an injunction or other equitable relief to prevent a breach or threatened breach of this Agreement by the other Party, without the necessity of posting a bond or other security, and in that case, both BMT and Vigor each irrevocably consents to the exclusive jurisdiction of the state and federal courts located in Seattle, Washington, USA, waives any objections that venue is an inconvenient forum, and will not initiate any action related to this Agreement against Vigor or any of its Affiliates in any other jurisdiction.

**11.    Independent Contractor.** Vigor and BMT are independent contractors, and nothing in this Agreement creates a joint venture or partnership, establishes a relationship of principal and agent, employer and employee, or any other relationship of a similar nature between the Parties. Neither Party will represent the other Party in any capacity, bind the other Party to any contract, or create or assume any obligation on behalf of the other Party for any purpose whatsoever, except as expressly authorized by this Agreement.

**12.    Insurance.** Without limiting BMT's obligation to indemnify Vigor or any of its other obligations under this Agreement, BMT will maintain at its own expense, unless otherwise agreed by the parties, the following insurance:

(a)    Professional Liability Insurance with a limit of not less than five million US dollars ($5,000,000) per claim. BMT warrants that any retroactive date applicable to coverage under this policy precedes the Effective Date, and BMT agrees that it will maintain continuous coverage through an extended discovery period so that claims made during the term of the Prime Contract and for five years after its expiration will be covered by this insurance.

(b)    Commercial General Liability insurance with endorsements as necessary to cover liability arising from premises operations, independent contractors, products-completed operations hazard, personal injury, and contractual liability, with a limit of not less than five million US dollars ($5,000,000) each occurrence and five million US dollars ($5,000,000) aggregate. This insurance will (i) be written on an occurrence basis; (ii) name Vigor and its affiliates as additional insureds; and (iii) be primary with respect to any insurance or self-insurance programs maintained by Vigor.

(c)    An advertising injury endorsement to the Commercial General Liability insurance policy described above with a limit of not less than five million US dollars ($5,000,000) per claim.

(d)    An Umbrella Liability policy in an amount not less than five million US dollars ($5,000,000), covering the acts and omissions of BMT's Resources and agents.

All policies (i) will be written by insurers that are licensed to do business in the states of Oregon and Washington; (ii) will be written by Chubb or ITIC mutual or any equivalent insurance companies or mutuals; (iii) will provide that Vigor will be given 30 days' advance written notice of cancellation or reduction in coverage, (iv) be endorsed to (A) waive subrogation to the extent available or allowable under BMT's insurance policy; and (B) be primary with respect to any insurance or self-insurance programs maintained by Vigor. If BMT fails to comply with these insurance requirements within five (5) business days after Vigor has notified it of the failure, Vigor may, but need not, at its election, purchase required insurance coverage and deduct the premium from the Royalties otherwise payable to BMT. Any limits specified in this Section may be achieved through a combination of primary and umbrella or excess liability policies. On or prior to the Effective Date, and as the insurance policies expire, BMT will deliver copies of certificates of insurance for each required policy to Vigor at the address for notices and will send a copy of those certificates to: Vigor Risk Management, 5555 N. Channel Avenue, Portland, OR 97217.

13 - License Agreement

| Initials |
|---|


**13.    Notices.** Each notice, consent, request, or other communication required or permitted under this Agreement will be in writing, will be delivered personally or sent by certified mail (postage prepaid, return receipt requested), e-mail (with electronic confirmation of receipt and a confirmation hard copy sent by regular mail no later than the following business day) or by a recognized US overnight courier, and will be addressed as follows:

If to Vigor or any Vigor Affiliate, to:       Vigor Works LLC
                                         5555 N. Channel Avenue, Building No. 71
                                         Portland, OR 97217 USA
                                         Attn:  MSV-L Project Manager

                with a copy to:       Vigor Industrial LLC
                                          5555 N. Channel Avenue, Building No. 71
                                         Portland, OR 97217 USA
                                         Attention:  General Counsel

If to BMT, to:                       BMT Designers & Planners, Inc.
                                           4401 Ford Avenue, Suite 1000
                                         Alexandria, VA 22302 USA

Each notice, consent, request, or other communication will be deemed to have been received by the Party to whom it was addressed (w) when delivered if delivered personally; (x) on the fifth business day after the date of mailing if mailed postage prepaid, certified first class mail, return receipt requested; (y) on the first business day after the electronic delivery or (z) on the date officially recorded as delivered according to the record of delivery if delivered by overnight courier.  Each Party may change its address for purposes of this Agreement by giving written notice to the other Party in the manner described above.

**14.    Restrictions on Assignment.**

**14.1    *By BMT.*** BMT will not assign any right or subcontract or otherwise delegate any duty under this Agreement, whether by transfer, merger, operation of law, or otherwise, without the consent of an authorized Vigor representative, which shall not be unreasonably withheld, conditioned or delayed. A change in the control (voting or otherwise) of BMT that results in BMT not being directly or indirectly owned by BMT Group Ltd. will be deemed an assignment for purposes of this Section.  If Vigor authorizes an assignment or delegation, that authorization will not release BMT from any of its obligations under this Agreement unless:  (a) that authorization expressly releases BMT; (b) the assignee or delegate agrees in writing to be bound by this Agreement for the benefit of Vigor; and (c) any agreement between BMT and the assignee or delegate states that Vigor has the right to enforce BMT's rights against the assignee or delegate. Any attempted assignment or delegation by BMT without Vigor's consent will be void.

**14.2    *By Vigor.*** Except as expressly permitted in Section 3 above and elsewhere in this Agreement, Vigor will not assign any right or subcontract or otherwise delegate any duty under this Agreement, whether by transfer, merger, operation of law, or otherwise, without the consent of an Authorized Representative of BMT, which shall not be unreasonably withheld, conditioned or delayed.  A change in the control (voting or otherwise) of Vigor will not be deemed an assignment for purposes of this Section.  If BMT authorizes an assignment or delegation, that authorization will not release Vigor from any of its obligations under this Agreement unless:  (a) that authorization expressly releases Vigor; (b) the assignee or delegate agrees in writing to be bound by this Agreement for the benefit of BMT; and (c) any agreement between Vigor and the assignee or delegate states that BMT has the right to enforce Vigor's rights against the assignee or delegate.  Any attempted assignment or delegation by Vigor without BMT's consent will be void. BMT consents to Vigor's assignment of this Agreement in connection with Vigor's assignment of the Prime Contract.

14 - License Agreement


Initials

**15.    Succession.** This Agreement will bind and inure to the benefit of each Party and its permitted successors, assigns, and delegates.

**16.    Disputes.** Whenever disputes, disagreements or misunderstandings arise under this Agreement, Vigor and BMT will attempt in good faith to resolve the issues involved by discussion between senior representatives of each Party and mutual agreement as soon as practicable. Disputes involving the Government will be resolved as described in Section 7.1 (Changes Initiated by and Disputes involving the Government) of the MSVL Subcontract. In all other cases, the following will apply:

### 16.1    *Technical Mediation.*

(a)    If the Parties are unable to resolve a dispute, disagreement or misunderstanding, they agree to use a process of *"Technical Mediation"* to help resolve disputes that are of a technical nature, including disputes as to BMT's Project IP and whether they conform to the Specifications, and any other dispute that the Parties agree to submit to Technical Mediation.

(b)    Technical Mediation will be conducted in Seattle, Washington. The Parties will agree on the selection of one or more persons to serve as technical mediator. If the Parties are unable to agree on an individual to serve as technical mediator, the Parties will ask the American Bureau of Shipping Technical Services (or its successor entity) to appoint a technical mediator who is not employed by or formally affiliated with American Bureau of Shipping Technical Services. The technical mediator must be a naval architect, marine surveyor, ship builder or ship repairer, who is knowledgeable about marine construction. The technical mediator will promptly hear and consider all information presented by the Parties about the dispute, will assist the Parties in resolving the dispute, and if requested by either Party, will make recommendations as to how the mediator would rule on the dispute as a fact finder. Any decision or recommendation of the technical mediator is non-binding on the Parties unless the Parties mutually agree in writing in advance of the decision or recommendation that the mediator's decision or recommendation is to be final and binding as if made in a binding arbitration. Neither Party may recover, and the technical mediator is not empowered to award, attorney fees incurred in Technical Mediation or technical arbitration. Any non-binding matter submitted to Technical Mediation may subsequently be referred to binding arbitration as provided in Section 16.2.

### 16.2    *Binding Arbitration.*

(a)    Failing resolution by mutual agreement or Technical Mediation, all claims, disputes, disagreements or misunderstandings arising under or in connection with or in relation to the Deliverables, the Source Documents and/or this Agreement will be decided by final and binding arbitration in accordance with the Commercial Arbitration Rules of the International Chamber of Commerce. To invoke arbitration under this Section 16.2, either Party must notify the other, in writing, (a) describing in reasonable detail the issue(s) to be arbitrated, and (b) a demand for arbitration of those issues. If the dispute involves an aggregate monetary claim of less than $1,000,000, a single neutral arbitrator will resolve the dispute. In all other cases, each Party will appoint one arbitrator and the two arbitrators so appointed will mutually select the third arbitrator. In no event will any arbitrator have a past or present business relationship to any of the Parties. The arbitration will be held in Seattle, Washington. In rendering any decision(s) or award, the single arbitrator or the arbitration panel (as appropriate, the *"Arbitral Tribunal"*) will determine the rights and obligations of the Parties in accordance with the Laws of the State of New York and the United States of America. All statutes of limitation that would otherwise be applicable will apply to any arbitration proceeding.

(b)    For disputes arising under or related to Section 4 (Royalty), each Party will submit to the Arbitral Tribunal, and will exchange with each other Party in advance of the arbitration hearing,


Initials

its last best offer regarding the calculation, payment or any other matter related to the Royalty due and owing under this Agreement. The Arbitral Tribunal will select only one of the two submitted offers, which will be binding on the Parties.

(c)    Any actions or proceedings in connection with arbitration, including appointment of the arbitrators, enforcement or vacating of any award, the granting of injunctive relief, or appeals must be brought exclusively in the state and federal courts sitting in Seattle, Washington, to whose exclusive jurisdiction and venue the Parties hereby irrevocably submit.

(b)    The arbitrator must use all reasonable efforts to render a decision within ninety (90) days following his or her appointment and in the case of a three member arbitration panel, the arbitration panel must use all reasonable efforts to render a decision within ninety (90) days following the appointment of the third arbitrator. The Arbitral Tribunal must render a written decision, signed by the members of the Arbitral Tribunal, explaining the reasons for its award, including a full statement of the facts as found, the rules of law applied in reaching its decision, and a statement regarding the disposition of each claim, and that decision will be final and binding. If the Arbitral Tribunal consists of three members, the decision of any two of them will be final and binding. Such decision or award is fully enforceable, and judgment on that award may be entered by, or application may be made for judicial acceptance to, any court having jurisdiction over the Parties or the dispute.

(c)    The Arbitral Tribunal is bound by the provisions of this Agreement and has no power to add to, subtract from, or modify any of the terms of this Agreement. The Arbitral Tribunal has no power to award any attorney fees, consequential damages, or punitive damages. The arbitration decision or award is the sole and exclusive remedy between them regarding any claims, counterclaims, issues, or accountings presented or pled to the Arbitral Tribunal. Neither Party has the right to commence or prosecute any action before any court on any dispute, conflict, or controversy arising out of or in relation to this Agreement or the other Contract Documents, except (a) for an action to compel arbitration in accordance with this Section 16; (b) for enforcement of the decision(s) or award(s) of the Arbitration Tribunal; or (c) to seek equitable relief as and when expressly permitted by this Agreement and the other Contract Documents. Any arbitration may include any other person substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration, provided that other person has agreed to be bound by that arbitration.

16.3    *Governing Law.* This Agreement will be governed by the laws of the State of New York, (and the United Nations Convention on Contracts for the International Sale of Goods will not apply to their interpretation or enforcement of this Agreement), except that any provision in this Agreement that is (a) incorporated in full text or by reference from the Flow Down Clauses, or (b) incorporated in full text or by reference from any agency regulation that implements or supplements the Flow Down Clauses, or (c) that is substantially based on any such agency regulation or Flow Down Clause, will be construed and interpreted according to the Federal common law of Government contracts as enunciated and applied by Federal judicial bodies, Boards of Contract Appeals, and quasi-judicial agencies and bodies of the Federal Government.

16.4    *Confidentiality.* Neither a Party nor any mediator or arbitrator may disclose the existence, content, or results of any mediation or arbitration without the prior written consent of all of the Parties, and the decision of the mediators and arbitrators must be kept confidential absent such consent.

16.5    *Work Continuation and Payment.* Unless Vigor expressly agrees otherwise in writing, nothing in this Agreement will relieve BMT from any of its obligations under this Agreement pending resolution of any dispute.

16 - License Agreement



**16.6** *Remedies.* All remedies are cumulative and in addition to any other remedies a Party may have at law or in equity, unless this Agreement expressly provides otherwise.

**16.7** *Notice of Intent to Prosecute Claim.* Except where a shorter notice period is required by this Agreement, neither Party will make any claim against the other Party, its sureties or the Government, or institute any suit, action, or proceeding against the other Party, its sureties, or the Government without giving the other Party at least ten (10) days' prior written notice of its intention to do so. That notice will include a description of the claim in reasonable detail, the amount of damages alleged and a description of the calculation of those damages. In no event will BMT make any claim or initiate any suit, action, or proceeding against a Customer or a Customer's sureties in connection with a Project.

**16.8** *Applicability to Lower Tier Subcontractors and Suppliers.* BMT will cause each of its lower-tier subcontractors that provides Deliverables valued at more than $500,000 to agree to the choice of law provision and to the arbitration and other provisions in this Section 16 (including with respect to venue and jurisdiction), such that any dispute arising from or related to the this Agreement may be resolved in a single proceeding subject to the uniform application of the choice of law, arbitration and other dispute resolution provisions set forth in this Section 16.

**16.9** *Costs and Fees.* Each Party will pay one-half of the mediation or arbitration fee, and each Party will bear its own legal fees.

**16.10** *Availability of Injunctive Relief.* Notwithstanding Section 16.1 (Technical Mediation), Section 16.2 (Binding Arbitration) or Section 16.7 (Notice of Intent to Prosecute Claim), either Party may, without violating this Agreement, seek from a court any interim or provisional relief that may be necessary to protect the rights or property of that Party pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy).

**17.** **Waiver.** A Party's delay or failure to enforce or insist on strict compliance with any provision of this Agreement will not constitute a waiver or otherwise modify this Agreement. A Party's waiver of any right granted under this Agreement on one occasion will not: (a) waive any other right; (b) constitute a continuing waiver; or (c) waive that right on any other occasion.

**18.** **Amendments.** The Parties may amend this Agreement only by a written instrument that is signed by an Authorized Representative of the Party to be bound.

**19.** **Interpretation.** Both Parties have had the opportunity to have this Agreement reviewed by their attorneys. Therefore, no rule of construction or interpretation that disfavors the Party drafting this Agreement or any of its provisions, or that favors the other Party, will apply to the interpretation of this Agreement. Instead, this Agreement will be interpreted according to the fair meaning of its terms. Caption headings are for convenience of reference only and will not in any way limit or otherwise affect the provisions of any section. The term "and/or" means each and all of the persons, words, provisions or items connected by that term; i.e., it has a joint and several meaning. The word "business day" means Monday through Friday except for federal holidays. Any other reference to a "day" means a calendar day unless it is expressly limited to a business day. All references to "$" or to "dollars" means United States Dollars. The words "includes" and "including" are not limited in any way and mean "includes or including without limitation." The word "person" includes individuals, corporations, partnerships, limited liability companies, co-operatives, associations and other natural and legal persons. The words "will," "shall," and "must" are synonyms, and each refers to action that is mandatory rather than optional. If there is a clear and direct conflict between or among this Agreement and any of the documents attached to or incorporated in this Agreement, that conflict will be resolved in the following order of priority: (a) the Flow Down Clauses and any other FARS/DFARS applicable to the Prime Contract; (b) the provisions in the Prime Contract regarding (i) the Government's Intellectual Property Rights and warranty of data; and (ii) information security



| Initials |
|---|
|  |

requirements, operations security requirements, and communications security requirements; (c) this Agreement; (d) the Master Subcontract; and (e) the provisions in the Prime Contract other than those described in subsections (a) and (b) above.

20.    **Severability.**  If any court, arbitrator, or arbitration panel finds any provision of this Agreement to be invalid or otherwise unenforceable, that provision will be modified to the extent necessary for it to be enforceable.  However, that finding will not affect the validity of any other provision of this Agreement, and the rest of this Agreement will remain in full force and effect unless enforcement of this Agreement as modified would be grossly inequitable under all of the circumstances or would frustrate the primary purposes of this Agreement.

21.    **Third Parties.**  The Parties acknowledge that the Government is an intended third party beneficiary of this Agreement.  Nothing in this Agreement is intended to (a) benefit any person other than the Parties and the Government; or (b) give any third persons any right to enforce this Agreement.

22.    **Counterparts and Delivery.**  This Agreement any its amendments may be executed in counterparts.  Each counterpart will be considered an original, and all of them, taken together, will constitute a single agreement.  Facsimile signatures will be deemed original signatures for all purposes under this Agreement.  When properly signed, this Agreement and its amendments may be delivered by facsimile or electronically, and any such delivery will have the same effect as physical delivery of a signed original.

23.    **Entire Agreement.**  This Agreement, the TAA and the MSVL Subcontract are the entire agreement and understanding between the Parties regarding the Project IP, and they supersede and replace the Teaming Agreement and all prior and contemporaneous agreements and understandings regarding that subject matter.  Nothing in this Agreement supersedes, replaces or amends the MSVL Subcontract or the TAA, and the MSVL Subcontract and the TAA remains in full force and effect in accordance with their respective terms.

| BMT: | Vigor: |
|---|---|
| **BMT Designers & Planners, Inc.** | **Vigor Works LLC** |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: March 8, 2018 | Date: March 8, 2018 |

| Initials |
|---|

EXHIBIT 1

BANK GUARANTEE AND BMT COMFORT LETTER

*[TO BE ISSED BY BARCLAYS BANK PLC]*

Vigor Works LLC
5555 N. Channel Avenue, Building 72
Portland, OR 97217
Attn: Chief Financial Officer

February ___, 2018

Dear Sirs,

**OUR GUARANTEE REFERENCE: MRGI**

We are informed that BMT Designers & Planners (the "Seller") has entered into two contracts with you, each dated 28 September 2017 (each, a "Contract" and collectively, the "Contracts"): (a) a Master Subcontract Agreement (MSV-(L)) that, among other things, requires Seller to provide engineering, design, logistics, analysis, goods and services that you will use to build a prototype vessel (the "Vessel") for the United States Army (the "Customer") under your contract with the Customer (the "Prime Contract"); and (b) a License Agreement in which Seller, among other things, grants you the right to use certain intellectual property. We have issued this bank guarantee for USD 3,000,000 (United States Dollars Three Million) to secure Seller's performance of the Contracts.

On behalf of the Seller, we Barclays Bank PLC, hereby give you our guarantee and undertake to pay you any amount or amounts, in one or more draws not exceeding in total a maximum of USD 3,000,000 (United States Dollars Three Million), as it may be reduced in accordance with this Guarantee (the "Guarantee Amount") on receipt of your first demand in writing over an original handwritten signature Accompanied by either:

1. The Seller's admission in writing that the Seller is in breach of one or more of its obligations under either or both of the Contracts, or

2. An arbitration award or court judgement determining that Seller is liable to you under one or both of the Contracts.

In addition, if we receive either (a) your certification signed by your President, Chief Operating Officer or Chief Financial Officer that (i) you have filed a complaint against Seller or one of its affiliates for breach of either or both of the Contracts and (ii) you have provided a true, accurate and complete copy of that complaint; or (b) your certification that the Vessel has not completed Extended Acceptance Testing; and in either case we do not deliver to you at least 30 days before the Expiry Date a replacement guarantee (a "Replacement Guarantee") with substantially the same terms, then we Barclays Bank PLC, hereby give you our guarantee and undertake to pay you any amount or amounts in one or more draws not exceeding the Guarantee Amount upon receipt of your demand, in writing over an original handwritten signature, that we receive at any time within the 30 day period immediately preceding the Expiry Date.

Any demand made by you under this Guarantee must be received at Barclays Bank PLC, Trade Operations, One Snowhill, Snow Hill Queensway, Birmingham B4 6GN, UK and must bear the dated confirmation of your bankers that the signature thereon is authentic.

19 - License Agreement



Initials

If the Seller shall deliver to us, at our address specified above, (a) your written confirmation, over an original handwritten signature, that the Customer has acknowledged in writing that Preliminary Design Review has been successfully completed and/or the builder is authorized to initiate procurement of materials under the Prime Contract, which confirmation must bear the dated confirmation of your bankers that the signature thereon is authentic; and (b) a written certification signed by Seller's President, Chief Operating Officer or Chief Financial Officer confirming that your written confirmation is true, accurate and complete; then upon our receipt of that confirmation, the Guarantee Amount shall be reduced to USD 2,000,000 (United States Dollars Two Million).

If the Seller shall deliver to us, at our address specified above, (a) your written confirmation, over an original handwritten signature, that the Customer has acknowledged in writing that Critical Design Review has been successfully completed and/or the builder is authorized to initiate production of the Vessel under the Prime Contract, which confirmation must bear the dated confirmation of your bankers that the signature thereon is authentic; and (b) a written certification signed by Seller's President, Chief Operating Officer or Chief Financial Officer confirming that your written confirmation is true, accurate and complete; then upon our receipt of that confirmation, the Guarantee Amount shall be reduced to USD 1,000,000 (United States Dollars One Million).

This Guarantee is valid for written demands received by us on or before _____ *[insert date that is the fourth anniversary of the date of this Guarantee]* (the "Expiry Date"), after which date our liability to you under this Guarantee will cease and this Guarantee will be of no further effect, whether or not this Guarantee has been returned to us.

For the avoidance of doubt, any document(s) received by way of facsimile or similar electronic means is/are not acceptable for any purpose(s) under this Guarantee.

This Guarantee is personal to you and is not assignable or transferable, except that you may endorse, transfer or assign this Guarantee to any person to whom you have assigned and transferred both the Prime Contract and the Contracts (the "Assignee/Transferee") and that we and the Seller have provided our prior written consent to such assignment or transfer, and that transfer or assignment will be effective following providing our consent, when we receive, over an original signature, written notice from you that you have transferred or assigned both the Prime Contract and the Contracts to that Assignee/Transferee, you identify the name and address of that Assignee/Transferee, and that notice bears the dated confirmation of your bankers that the signature thereon is authentic.

Except as expressly provided in the preceding paragraph, nothing in this Guarantee shall confer on any third party any benefit under, or the right to enforce any term of, this Guarantee.

This Guarantee and any non-contractual obligations arising out of or in connection with it shall be governed by English law. The courts of England shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Guarantee.

Yours faithfully,

For and on behalf of
Barclays Bank PLC

Signed...................................................

==[Insert Date]==

20 - License Agreement

| Initials |
| --- |

**PRIVATE AND CONFIDENTIAL**

Vigor Works LLC
9700 SE Lawnfield Road
Clackamas, Oregon 97015
United States
Attn:  Joe Corvelli

- DRAFT -

*Re: Letter of Comfort in relation to the MSV(L) Subcontract and License Agreement*

Dear Mr Corvelli,

The purpose of this letter is to provide Vigor the comfort that it seeks from BMT Group Ltd, the ultimate parent of BMT Designers & Planners, Inc. (D&P), with respect to D&P's performance under the subcontract Vigor will enter into with D&P in regard to the MSV(L) vessel program, and under the license agreement Vigor and D&P will enter into for the designs and other intellectual property related to that vessel.

BMT is owned by its employees through the BMT Employee Benefit Trust.  We are a long standing trusted business partner with the defence industries in the United States, Canada, United Kingdom and Australia (for further details please see www.bmt.org).

D&P is a wholly owned sub-subsidiary of BMT Group Ltd.  In accordance with the Foreign Ownership Control and Inflence mitigation instruments required by Defense Security Service, D&P is subject to a Proxy Agreement as a result, BMT Group Ltd and other affiliates are restricted from asserting direct control and influnce of D&P.  Therfore, D&P is governed by a Proxy Arrangement in partnership with the US Department of Defense which requires a number of outside independent non executive directors, of which the chairman of the Board is one, Mr. Paul Schneider (former Deputy Head of Homeland Security).

D&P has had and will continue to have sufficient equity and bank facilities in place to continue as a going concern over the foreseeabe future.  SunTrust Bank is the only creditor that has security over the assets of D&P.  There are no formal charges on assets by way of security granted to BMT's principal banker, Barclays Bank Plc, or any other creditor.  The Pension Regulator in the UK and the Pension Benefit Guaranty Corporation in the US have certain rights in the event of formal insolvency events should any employer company participating in the UK or US defined pension schemes.

The most likely cause of D&P entering into a formal insolvency process (such as Chapter 7 or 11 of the Bankruptcy Code) would be through a successful professional negligence claim.  We believe that risk is very low because the company has a rigorous quality control system in place in addition to its

participation in BMT's global professional indemnity insurance programme, which has proven to be more than adequate for BMT's needs over many decades.

We can also assure you that NG, DSL and APL will grant to D&P rights to the intellectual property related to the MSV(L) vessel program, and those rights are sufficient for D&P to grant to Vigor the rights described in their license agreement.

21 - License Agreement

This letter of comfort will automatically expire upon completion or termination of the MSV (L) subcontract and License Agreement.  We look forward to working with you on this very exciting programme.

Yours sincerely,

David McSweeney
Finance Director
For and on behalf of BMT Group Ltd

Initials

APPENDIX A
BASELINE IP

| Name | Number | Revision |
|------|--------|----------|
| 2D LINES PLAN | E3107-100-00-01 | ISSUE E |
| ABS STRUCTURAL CALCULATION REPORT | E3107-100-59 | ISSUE A |
| BEACH LANDING ARRANGEMENT | E3107-673-00-02 | ISSUE J |
| C4N BILL OF MATERIALS | NA | 04a |
| CAUSEWAY LANDING ARRANGEMENT | E3107-673-00-03 | ISSUE C |
| DECK SCANTLINGS TO ABS HSNC 2016 | E3107-100-57 | ISSUE A |
| DESIGN ACCELERATION TO ABS HSNC 2016 | E3107-100-55 | ISSUE A |
| ELECTRICAL EQUIPMENT LIST | 37868/DSL00365/B | NA |
| ELECTRICAL ONE LINE DRAWING | 300-BP01103-001 | NA |
| ELECTRICAL POWER LOAD ANALYSIS | 835-BP01103-300 | - |
| FUNCTIONAL DRAFT DRAWING | E3107-603-00-01 | ISSUE F |
| GENERATOR EXHAUST SYSTEM | 342-BP01103-001 | NA |
| HULL SCANTLINGS TO ABS HSNC 2016 | E3107-100-56 | ISSUE A |
| LIGHTSHIP WEIGHT ESTIMATE REPORT | E3107-833-56 | ISSUE G |
| LOADING CONDITIONS REPORT | E3107-833-54 | ISSUE F |
| MACHINERY ARRANGEMENT | E3107-201-00-01 | ISSUE D |
| MIDSHIP AND TYPICAL STRUCTURAL SECTION DRAWING | E3107-117-00-01 | ISSUE A |
| MIDSHIP AND TYPICAL STRUCTURAL SECTION DRAWING | E3107-117-00-01 | ISSUE B |
| MSV(L) GENERAL ARRANGEMENT | E3107-601-00-02 | ISSUE R |
| MSV(L) Resistance and Seakeeping Model Test Report | SMC 503/01 | ISSUE 02 |
| MSV(L) SEAKEEPING REPORT | E3107-835-61 | ISSUE A |
| MSV(L) STABILITY REPORT | E3107-835-56 | ISSUE E |
| PAYLOAD AND DRAFT PLANS | E3107-673-00-01 | ISSUE M |
| PERFORMANCE AND RANGE REPORT | E3107-835-60 | ISSUE E |
| PROPULSION ENGINE EXHAUST SYSTEM | 259-BP01103-001 | NA |
| PROPULSION EQUIPMENT SELECTION REPORT | E3107-835-63 | ISSUE A |
| STRUCTURAL WEIGHT CALCULATION | E3107-833-55 | ISSUE C |
| MSV(L) SYSTEM DRAWINGS - FUEL SUPPLY AND TRANSFER SYSTEM | 261-BP01103-001 | NA |
| MSV(L) SYSTEM DRAWINGS - HVAC SYSTEM | 514-BP01103-001 | NA |
| MSV(L) SYSTEM DRAWINGS - POTABLE WATER SYSTEM | 516-BP01103-001 | NA |
| MSV(L) SYSTEM DRAWINGS - SEA WATER COOLING SYSTEM | 256-BP01103-001 | NA |
| MSV(L) SYSTEM DRAWINGS - SEAWATER FIREFIGHTING SYSTEM DRAWING | 521-BP01103-001 | NA |
| MSV(L) SYSTEM DRAWINGS - WASTE WATER SYSTEM | 593-BP01103-001 | NA |
| MSV(L) RENDERINGS | NA | NA |

23 - License Agreement

Initials

APPENDIX B

FLOWDOWN PROVISIONS

The following Federal Acquisition Regulations ("*FAR*"), Defense Federal Acquisition Regulations Supplement ("*DFARS*") clauses, and other supplemental agency clauses (collectively, "*Flow Down Clauses*") will apply to this Agreement, as required by the terms of the Prime Contract or by operation of law or regulation. However, to the extent that a note below renders a particular Flow Down Clause inapplicable to this Agreement or to any Work Order, that Flow Down Clause will be deemed self-deleting.

Any mandatory Flow Down Clause that may have been inadvertently omitted from this Appendix will nonetheless be deemed to be included. Also, BMT will, at Vigor's request, accept any additional or different Flow Down Clauses that Vigor may, from time to time, deem necessary to facilitate compliance with the Prime Contract.

The effective version of each Flow Down Clause will be the same version that appears in the Prime Contract. In all such Flow Down Clauses, except to extent the context requires otherwise, the term "Contractor" will mean BMT, the term "Contract" will mean this Agreement, and the terms "Government" and "Contracting Officer" will mean Vigor and its purchasing representative, respectively.

To the extent that any Flow Down Clauses call for disputes to be resolved under the FAR "Disputes" clause, any disputes to which the Government is not a party will instead be disposed of according to the dispute provisions of this Agreement.

**PART I: Standard Flow Down Clauses**

| CLAUSE # | TITLE | APPLICABILITY NOTES |
|---|---|---|
| 52.203-6 | Restrictions on Subcontractor Sales to the Government. | All Orders in excess of the simplified acquisition threshold. |
| 52.203-7 | Anti-Kickback Procedures | All Orders in excess of $150,000, excluding paragraph (c)(1). |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions | All Orders in excess of $150,000. |
| 52.203-13 | Contractor Code of Business Ethics and Conduct | All Orders in excess of $5.5 million and having a performance period of more than 120 days. |
| 52.203-14 | Display of Hotline Poster(s). | All Orders in excess of $5.5 million, excluding Orders for the acquisition of a commercial item or to be performed entirely outside the United States. |
| 52.203-15 | Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 | All Orders funded in whole or in part with Recovery Act funds. |
| 52.203-17 | Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights | All Orders in excess of the simplified acquisition threshold. |
| 52.203-19 | Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements | All Orders. |
| 52.204-2 | Security Requirements. | All Orders that involve access to classified information. |

24 - License Agreement

Initials



| 52.204-9 | Personal Identity Verification of Contractor Personnel. | All Orders pursuant to which Seller's employees are required to have routine physical access to a Federally-controlled facility and/or routine access to a Federally-controlled information system. |
|---|---|---|
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards | All Orders. |
| 52.204-21 | Basic Safeguarding of Covered Contractor Information Systems | All Orders pursuant to which the Seller may have Federal contract information residing in or transiting through its information system, excluding Orders for commercially available off-the-shelf items. |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | All Orders in excess of $35,000 in value, excluding Orders for commercially available off-the-shelf items. |
| 52.211-5 | Material Requirements | All Orders. |
| 52.211-15 | Defense Priority and Allocation Requirements | All Orders bearing a notice of DPAS priority rating. |
| 52.214-26 | Audit and Records—Sealed Bidding. | All Orders expected to exceed the threshold in FAR 15.403-4(a)(1) for submission of certified cost or pricing data. |
| 52.214-27 | Price Reduction for Defective Certified Cost or Pricing Data—Modifications—Sealed Bidding | All Orders. |
| 52.214-28 | Subcontractor Certified Cost or Pricing Data—Modifications—Sealed Bidding. | All Orders that, when entered into, exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4(a)(1). |
| 52.215-2 | Audit and Records—Negotiation. | All Orders that exceed the simplified acquisition threshold, and:  (1) that are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these; (2) for which certified cost or pricing data are required; or (3) that require the Seller to furnish reports as discussed in paragraph (e) of this clause. |
| 52.215-10 | Price Reduction for Defective Certified Cost or Pricing Data | All Orders. |
| 52.215-11 | Price Reduction for Defective Certified Cost or Pricing Data—Modifications | All Orders. |
| 52.215-12 | Subcontractor Certified Cost or Pricing Data. | All Orders that, when entered into, exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4(a)(1). |
| 52.215-13 | Subcontractor Certified Cost or Pricing Data—Modifications. | All Orders that, when entered into, exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4(a)(1). |
| 52.215-14 | Integrity of Unit Prices. | All Orders for other than: (1) acquisitions at or below the simplified acquisition threshold in FAR Part 2; (2) construction or architect-engineer services under FAR Part 36; (3) utility services under FAR Part 41; (4) services where supplies |

25 - License Agreement



| | | are not required; (5) commercial items; and (6) petroleum products. |
|---|---|---|
| 52.215-15 | Pension Adjustments and Asset Reversions. | All Orders that meet the applicability requirement of FAR 15.408(g). |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions. | All Orders that meet the applicability requirements of FAR 15.408(j). |
| 52.215-19 | Notification of Ownership Changes. | All Orders that meet the applicability requirement of FAR 15.408(k). |
| 52.215-21 | Requirements for Certified Cost or Pricing Data and Data Other Than Certified Cost or Pricing Data—Modifications | All Orders. |
| 52.215-22 | Limitations on Pass-Through Charges – Identification of Subcontract Effort | All Orders pursuant to which Seller intends to subcontract to a lower-tier subcontractor more than 70 percent of the total cost of work to be performed under this Order. |
| 52.215-23 | Limitations on Pass-Through Charges | All cost-reimbursement Orders that exceed the simplified acquisition threshold, except if Vigor's prime contract is with DoD, then all cost-reimbursement Orders and fixed-price Orders, except those identified in FAR 15.408(n)(2)(i)(B)(2), that exceed the threshold for obtaining cost or pricing data in accordance with FAR 15.403-4. |
| 52.219-8 | Utilization of Small Business Concerns | All Orders that offer further subcontracting opportunities if Vigor's prime contract requires a subcontracting plan. |
| 52.219-9 | Small Business Subcontracting Plan | All Orders expected to exceed $700,000, unless Seller is a small business concern or is providing a commercial item. |
| 52.222-1 | Notice to the Government of Labor Disputes | All Orders. |
| 52.222-4 | Contract Work Hours and Safety Standards —Overtime Compensation. | All Orders that may require or involve the employment of laborers and mechanics. |
| 52.222-17 | Nondisplacement of Qualified Workers | All Orders over the simplified acquisition threshold entered into for Seller to perform services under a services contract, as defined at FAR 22.001, that succeeds a contract for performance of the same or similar work at the same location and that has not been exempted by FAR 22.1203-2 or waived in accordance with FAR 22.1203-3. |
| 52.222-20 | Contracts for Materials, Supplies, Articles, and Equipment Exceeding $15,000 | All Orders. |
| 52.222-21 | Prohibition of Segregated Facilities | All Orders subject to FAR 52.222-26. |
| 52.222-26 | Equal Opportunity | All Orders not exempted by the rules, regulations, or orders of the Secretary of Labor issued under Executive Order 11246, as amended. |
| 52.222-35 | Equal Opportunity for Veterans | All Orders of $150,000 or more unless exempted |

26 - License Agreement



Initials

| | | by rules, regulations, or orders of the Secretary of Labor. |
|---|---|---|
| 52.222-36 | Equal Opportunity for Workers with Disabilities. | All Orders in excess of $15,000 unless exempted by rules, regulations, or orders of the Secretary of Labor. |
| 52.222-37 | Employment Reports on Veterans | All Orders of $150,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor. |
| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act | All Orders that exceed $10,000 and will be performed wholly or partially in the United States, unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to section 3 of Executive Order 13496 of January 30, 2009. |
| 52.222-41 | Service Contract Labor Standards | All Orders subject to the Service Contract Labor Standards statute. |
| 52.222-50 | Combating Trafficking in Persons | All Orders. |
| 52.222-51 | Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment— Requirements. | All Orders for exempt services. |
| 52.222-53 | Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services— Requirements. | All Orders for exempt services. |
| 52.222-54 | Employment Eligibility Verification | All Orders. |
| 52.222-55 | Minimum Wages Under Executive Order 13658 | All Orders subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and which are to be performed in whole or in part in the United States. |
| 52.222-60 | Paycheck Transparency (Executive Order 13673) | All Orders that exceed $500,000, at all tiers, for other than commercially available off-the-shelf items. |
| 52.222-62 | Paid Sick Leave Under Executive Order 13706 | All Orders subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and which are to be performed in whole or in part in the United States. |
| 52.223-3 | Hazardous Material Identification and Material Safety Data | All Orders requiring the delivery of hazardous materials. |
| 52.223-7 | Notice of Radioactive Materials | All Orders for radioactive materials meeting the criteria in paragraph (a) of this clause. |
| 52.223-18 | Encouraging Contractor Policies to Ban Text Messaging While Driving. | All Orders exceeding the micro-purchase threshold. |
| 52.225-8 | Duty-Free Entry. | All Orders pursuant to which:  (1) Supplies identified in the Schedule to be accorded duty-free entry will be imported into the customs territory of the United States; or (2) other foreign supplies in excess of $15,000 may be imported |

27 - License Agreement

Initials


| | | into the customs territory of the United States. |
|---|---|---|
| 52.225-13 | Restrictions on Certain Foreign Purchases. | All Orders. |
| 52.225-26 | Contractors Performing Private Security Functions Outside the United States | All Orders that will be performed outside the United States in areas of: (1) Combat operations, as designated by the Secretary of Defense; or (2) Other significant military operations, upon agreement of the Secretaries of Defense and State that the clause applies in that area. |
| 52.227-1 | Authorization and Consent. | All Orders expected to exceed the simplified acquisition threshold. |
| 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement. | All Orders expected to exceed the simplified acquisition threshold. |
| 52.227-9 | Refund of Royalties. | All Orders in which the amount of royalties reported during negotiation of the Order exceeds $250. |
| 52.227-10 | Filing of Patent Applications—Classified Subject Matter. | All Orders that cover or are likely to cover classified subject matter. |
| 52.227-11 | Patent Rights—Ownership by the Contractor. | All Orders for experimental, developmental, or research work to be performed by a small business concern or nonprofit organization. |
| 52.227-13 | Patent Rights—Ownership by the Government. | All Orders for experimental, developmental, or research work. |
| 52.227-14 | Rights in Data—General | All Orders. |
| 52.228-5 | Insurance—Work on a Government Installation. | All Orders that require work on a Government installation. |
| 52.230-2 | Cost Accounting Standards. | All Negotiated Orders in excess of $750,000, excluding negotiated Orders otherwise exempt from the requirement to include a CAS clause as specified in 48 CFR 9903.201-1. |
| 52.230-3 | Disclosure and Consistency of Cost Accounting Practices. | All Negotiated Orders in excess of $750,000, excluding negotiated Orders otherwise exempt from the requirement to include a CAS clause as specified in 48 CFR 9903.201-1. |
| 52.230-4 | Disclosure and Consistency of Cost Accounting Practices—Foreign Concerns | All Negotiated Orders in excess of $750,000, excluding negotiated Orders otherwise exempt from the requirement to include a CAS clause as specified in 48 CFR 9903.201-1. |
| 52.230-6 | Administration of Cost Accounting Standards | All Orders containing the clause at FAR 52.230-2, FAR 52.230-3, FAR 52.230-4, or FAR 52.230-5. |
| 52.232-40 | Providing Accelerated Payments to Small Business Subcontractors | All Orders with small business concerns. |
| 52.234-1 | Industrial Resources Developed Under Title III, Defense Production Act. | All Orders. |
| 52.242-15 | Stop-Work Order | All Orders. |
| 52.244-6 | Subcontracts for Commercial Items | All Orders. |
| 52.245-1 | Government Property. | All Orders under which Government property is acquired or furnished for Order performance. |
| 52.247-63 | Preference for U.S.-Flag Air Carriers. | All Orders that may involve international air |

28 - License Agreement


Initials

| | | transportation. |
|---|---|---|
| 52.247-64 | Preference for Privately Owned U.S.-Flag Commercial Vessels | All Orders. |
| 52.248-1 | Value Engineering. | All Orders. |
| 252.203-7001 | Prohibition on Persons Convicted of Fraud or Other Defense-Contract-Related Felonies. | All Orders that are first-tier subcontracts exceeding the simplified acquisition threshold, excluding Orders for commercial items or components. |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights. | All Orders. |
| 252.203-7004 | Display of Hotline Posters. | All Orders exceeding $5.5 million, excluding Orders for the acquisition of a commercial item. |
| 252.204-7000 | Disclosure of Information. | All Orders. |
| 252.204-7009 | Limitations on the Use or Disclosure of Third-Party Contractor Reported Cyber Incident Information. | All Orders for services that include support for the Government's activities related to safeguarding covered defense information and cyber incident reporting. |
| 252.204-7010 | Requirement for Contractor to Notify DoD if the Contractor's Activities are Subject to Reporting Under the U.S.-International Atomic Energy Agency Additional Protocol. | All Orders subject to the provisions of the U.S. International Atomic Energy Agency Additional Protocol. |
| 252.204-7012 | Safeguarding of Unclassified Controlled Technical Information | All Orders for operationally critical support or for which performance will involve covered defense information. |
| 252.208-7000 | Intent to Furnish Precious Metals as Government-Furnished Material. | All Orders for items containing precious metals. |
| 252.211-7000 | Acquisition Streamlining. | All Orders exceeding $1.5 million. |
| 252.211-7003 | Item Identification and Valuation | All Orders for items for which item unique identification is required in accordance with this clause. |
| 252.222-7006 | Restrictions on the Use of Mandatory Arbitration Agreements. | All Orders valued in excess of $1 million, excluding Orders for the acquisition of commercial items. |
| 252.222-7007 | Representation Regarding Combating Trafficking in Persons | All Orders. |
| 252.223-7006 | Prohibition on Storage, Treatment, and Disposal of Toxic or Hazardous Materials. | All Orders that require, may require, or permit Seller access to a DoD installation. |
| 252.223-7008 | Prohibition of Hexavalent Chromium | All Orders. |
| 252.225-7001 | Buy American and Balance of Payments Program | All Orders. |
| 252.225-7007 | Prohibition on Acquisition of United States Munitions List Items from Communist Chinese Military Companies. | All Orders for items covered by the United States Munitions List. |
| 252.225-7009 | Restriction on Acquisition of Certain Articles Containing Specialty Metals | All Orders for items containing specialty metals. |
| 252.225-7013 | Duty-Free Entry. | All Orders for: (1) qualifying country components; or (2) nonqualifying country |

29 - License Agreement


Initials

| | | |
|---|---|---|
| | | components for which the duty will exceed $200 per unit. |
| 252.225-7016 | Restriction on Acquisition of Ball and Roller Bearings. | All Orders, excluding Orders for: (1) commercial items; or (2) items that do not contain ball or roller bearings. |
| 252.225-7019 | Restriction on Acquisition of Anchor and Mooring Chain. | All Orders for items containing welded shipboard anchor and mooring chain, four inches or less in diameter. |
| 252.225-7021 | Trade Agreements | All Orders. |
| 252.225-7025 | Restriction on Acquisition of Forgings. | All Orders for forging items or for other items that contain forging items. |
| 252.225-7036 | Buy American—Free Trade Agreements--Balance of Payments | All Orders. |
| 252.225-7048 | Export-Controlled Items | All Orders. |
| 252.226-7001 | Utilization of Indian Organizations, Indian-Owned Economic Enterprises, and Native Hawaiian Small Business Concerns. | All Orders exceeding $500,000. |
| 252.227-7013 | Rights in Technical Data Noncommercial Items | All Orders pursuant to which technical data for noncommercial items, or for commercial items developed in any part at Government expense, is to be obtained from Seller for delivery to the Government. |
| 252.227-7014 | Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation. | All Orders pursuant to which noncommercial computer software or computer software documentation is to be obtained from Seller for delivery to the Government. |
| 252.227-7015 | Technical Data -- Commercial Items | All Orders pursuant to which technical data related to commercial items developed in any part at private expense will be obtained from Seller for delivery to the Government. |
| 252.227-7016 | Rights in Bid or Proposal Information. | All Orders. |
| 252.227-7019 | Validation of Asserted Restrictions--Computer Software. | All Orders pursuant to which Seller will be furnishing computer software to the Government. |
| 252.227-7030 | Technical Data--Withholding of Payment | All Orders that include the clause at 252.227-7013. |
| 252.227-7037 | Validation of Restrictive Markings on Technical Data | All Orders requiring the delivery of technical data. |
| 252.227-7038 | Patent Rights—Ownership by the Contractor (Large Business). | All Orders for experimental, developmental, or research work, excluding Orders for work to be performed by a small business concern or nonprofit organization. |
| 252.244-7000 | Subcontracts for Commercial Items and Commercial Components (DoD Contracts) | All Orders. |
| 252.246-7003 | Notification of Potential Safety Issues | All Orders for: (1) parts identified as critical safety items; (2) systems and subsystems, assemblies, and subassemblies integral to a |

Initials



|  |  | system; or (3) repair, maintenance, logistics support, or overhaul services for systems and subsystems, assemblies, subassemblies, and parts integral to a system. |
|---|---|---|
| 252.246–7007 | Contractor Counterfeit Electronic Part Detection and Avoidance System | All Orders for electronic parts or assemblies containing electronic parts. |
| 252.246-7008 | Sources of Electronic Parts. | All Orders for electronic parts or assemblies containing electronic parts, unless the Seller is the original manufacturer. |
| 252.247-7023 | Transportation of Supplies by Sea | All Orders pursuant to which Seller will transport supplies by sea. |
| 252.247-7024 | Notification of Transportation of Supplies by Sea | All Orders. |
| 252.249-7002 | Notification of Anticipated Contract Termination or Reduction. | All Orders exceeding $700,000. |

**PART II: Special Flow Down Clauses**

| CLAUSE # | TITLE | APPLICABILITY NOTES |
|---|---|---|
| 52.209-4020 | Anti-Terrorism (AT) Level I Training Requirement | All Orders requiring access to Army installations, facilities, or controlled access areas. |
| 52.209-4022 | iWatch Training | All Orders. |
| 52.204-4020 | Access and General Protection/Security Policy and Procedure | All Orders. |
| 52.209-4021 | Anti-Terrorism (AT) Awareness Training Requirement for Contractor Personnel Traveling Overseas | All Orders. |
| 52.209-4024 | Information Assurance (IA) / Information Technology (IT) Training | All Orders. |
| 52.215-4400 | Army Information Systems (IS) Security Requirement | All Orders requiring access to Government owned or operated automated information systems, networks, or databases. |
| 52.215-4405 | Access to the Detroit Arsenal: Identifying Contractor Employee; Non-Disclosure Statement | All Orders requiring access to the Detroit Arsenal. |
| 52.223-4002 | Use of Class I Ozone Depleting Substances | All Orders. |
| 52.246-11 | Higher-Level Contract Quality Requirement | All Orders for critical and complex items (see FAR 46.203(b) and (c)); or any Order requiring (i) control of such things as design, work operations, in-process control, testing and inspection; or (ii) attention to such factors as organization, planning, work instructions, documentation control, and advanced metrology.<br><br>Subcontractor shall comply with the following higher-level quality standard: ISO 9001:2015 (15 Sep 2015). |

Initials



| 252.227-7025 | Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends | All Orders. |
|---|---|---|
| 252.227-7026 | Deferred Delivery of Technical Data or Computer Software | All Orders. |
| 252.227-7027 | Deferred Ordering of Technical Data or Computer Software | All Orders. |
| 252.227-7039 | Patents--Reporting of Subject Inventions | All Orders. |
| 252.246-7001 | Warranty of Data | All Orders. |
| 52.227-10 | Filing of Patent Applications—Classified Subject Matter | All Orders. |

ORGANIZATIONAL CONFLICTS OF INTEREST
BMT and their subcontractors, consultants, parent companies, subsidiaries, joint ventures, or other business affiliates at any tier may be excluded from performing under this Agreement if the Government's Procuring Contracting Officer (PCO) determines that an Organizational Conflict of Interest (OCI) exists due to bias or unfair competitive advantage.

BMT shall flow down this provision in any subcontracts or other related instruments (at all tiers). BMT shall monitor their activities and the activities of their subcontractors and related entities, and promptly disclose any actual or potential OCIs and any actions taken or proposed to negate or mitigate such conflicts.

**PART III: Identification and Assertion of Restrictions on the Government's Use, Release, or Disclosure of Technical Data or Computer Software.**

The terms used in this provision are defined in the Rights in Technical Data--Noncommercial Items clause of the Prime Contract.

The identification and assertion requirements in this provision apply only to technical data, including computer software documentation, or computer software to be delivered with other than unlimited rights.

BMT asserts for itself, or the persons identified below, that the Government's rights to use, release, or disclose the following technical data or computer software should be restricted:

| Technical Data or Computer Software to be Furnished With Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person Asserting Restrictions**** |
|---|---|---|---|
| (LIST)***** | (LIST) | (LIST) | (LIST) |

*For technical data (other than computer software documentation) pertaining to items, components, or processes developed at private expense, identify both the deliverable technical data and each such item, component, or process. For computer software or computer software documentation identify the software or documentation.

**Generally, development at private expense, either exclusively or partially, is the only basis for asserting restrictions. For technical data, other than computer software documentation, development refers to development of the item, component, or process to which the data pertain. The Government's rights in computer software documentation generally may not be restricted. For computer software, development

32 - License Agreement



refers to the software. Indicate whether development was accomplished exclusively or partially at private expense. If development was not accomplished at private expense, or for computer software documentation, enter the specific basis for asserting restrictions.

***Enter asserted rights category (e.g., government purpose license rights from a prior contract, rights in SBIR data generated under another contract, limited, restricted, or government purpose rights under this or a prior contract, or specially negotiated licenses).

****Corporation, individual, or other person, as appropriate.

*****Enter "none" when all data or software will be submitted without restrictions.

33 - License Agreement



**APPENDIX C**

Form of Royalty Report

Initials